**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN WEILER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IKEA NORTH AMERICA SERVICES, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# NATURE OF THE ACTION

1. Defendant IKEA North America Services, LLC ("IKEA") owns and operates the website ikea.com/us.

2. When users visit IKEA's website, Defendant causes at least two trackers—the Meta Pixel and TikTok Pixel (collectively, the "Trackers")—to be installed on Website visitors' Internet browsers. These invisible trackers secretly collect a vast array of data about website visitors in a process referred to in the industry as "fingerprinting."

3. Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). *See, e.g, Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

4. By installing and using the Trackers without Plaintiff's prior consent and without a court order, IKEA violates CIPA section 638.51(a).

5. Plaintiff brings this action to prevent IKEA from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA section 638.51. Except as to her own personal experiences, the allegations are made on information and belief.

# PARTIES

6. Plaintiff Erin Weiler is domiciled in California. Plaintiff has visited the IKEA website numerous times over the last several years, including most recently on December 15 and 17, 2024; and on May 2, 28, and 30, 2025. Each time she visited IKEA's website, the website contained the tracking technologies at issue here, and hence, those technologies tracked her website activities. Plaintiff was in California when she visited the website. Plaintiff did not consent to the conduct at issue in this lawsuit.

7. Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed class members.

8. Defendant IKEA North America Services, LLC, is a Delaware corporation with its U.S. headquarters and principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from Defendant.

10. This Court has specific personal jurisdiction over Defendant because a substantial portion of the events giving rise to the claims alleged here occurred in this state.

11. Defendant also has purposefully directed its activities to the Central District of California by opening several brick-and-mortar stores in this district and regularly tracking individuals in this district through its website.

12. Ikea.com/us is an interactive website used for commercial purposes. IKEA customers view IKEA's website to plan their purchases before visiting the brick-and-mortar stores, or make purchases directly on the website. They can log onto the website and create a user account. The website can be used to view personalized information about purchase history, create wedding gift registries and general product wish lists, use interactive design tools, and other personalized functions.

13. Ikea.com/us is accessible and made available to California residents.

14. IKEA appeals to, and profits from, an audience in California, and California residents form a significant portion of the website's customer base.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED         2

15. It was foreseeable that California residents would use the website because IKEA knows that California residents frequently visit the website and that they will continue to do so. Indeed, as the fifth largest economy in the world, it would be unrealistic to *not* anticipate a large number of California residents using the website, particularly given the high number of brick-and-mortar stores located in this state.

16. IKEA also knows that Californians use the website because the website trackers at issue here collect website visitors' IP information, which discloses the state in which they are located.

17. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### Overview of the California Invasion of Privacy Act ("CIPA")

18. The California Legislature enacted CIPA to protect the privacy rights of California citizens. The California Legislature recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

19. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

20. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

21. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

22. Although CIPA was enacted before the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

**The Problem of Website Trackers**

23. When a person visits a website, the browser on the person's device makes a "request" for that site. Each request contains several pieces of information. Some of this information is passed along by default simply to help view the page, but not all of it. In the background, advertising code and invisible trackers on the website can also cause your browser to make dozens or even hundreds of requests to other hidden third parties who have tracking mechanisms embedded across the Internet to gather website user's information.

24. Data collected by third party trackers can be used to log online activity, and in turn, reveal a detailed behavioral profile of a person's online activity, from political affiliation, to education level, to income bracket.

25. This process is typically referred to as digital "fingerprinting."

26. Fingerprinting tracks users across platforms by combining device data points — screen settings, browser details, OS info, and IP address — to create a unique identifier that persists even when users opt to block cookies in their browsers.

27. Fingerprinting is akin to tracking a car by its license plate, make, model, and color. Instead of monitoring every place a person drives, trackers monitor everywhere a person goes on the Internet. This data has massive financial value.

28. For example, one seemingly mundane bit of data that is sometimes collected is a website visitor's IP address. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.

29. Through an IP address, the device's state, city, and zip code can be determined. They also allow companies to target specific households, businesses, and even individuals with ads that are relevant to their interests. Thus, knowing a user's IP address—and therefore geographical location—provides a level of specificity previously unfound in marketing.

30. IP targeting is one of the most targeted marketing techniques companies can employ because they can be used to personally identify individuals.

31. The widespread collection of IP addresses for commercial purposes also exposes website visitors to various cybersecurity risks, including DDos (Distributed Denial of Service) and malware installation, identity theft through account takeovers and phishing.

### The Trackers on IKEA's Website

*The Meta Pixel*

32. Meta (formerly known as Facebook) offers a suite of tools for website developers. One of those tools is Meta's pixel, which is an invisible 1x1 web

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED       5

element –an invisible pixel—that website owners can install on their websites. The Meta pixel allows Meta to track and monitor website visitors.

33. Meta describes its pixel as follows: "The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion)."

34. IKEA partnered with Meta to install its pixel on IKEA's website.

35. The Meta Pixel identifies consumers, gathers data based on website interactions, and correlates that data.

36. The Meta Pixel collected literally dozens of data points about Plaintiff and class members every time they visited a subject website, including personal information, operating system information, browser information, device type usage, geolocation data, url tracking, and identifying information.

37. Meta's tracking pixel is a "pen register" because it is a device or process that records or decodes dialing, routing, addressing, or signaling information from the electronic communications transmitted to or from IKEA's website.

38. In fact, the department within Meta responsible for web traffic data collection is called the "Signals" department.

39. Meta provided its pixel to IKEA for free. The reason is simple: Meta's business is largely based on data mining for commercial purposes, and uses the data for its own benefit.

40. Meta offers its pixel to website developers in a free version because Meta benefits and profits by other website's use of the technology. Meta can use the data it gleans from the pixel to power its algorithms, providing it insight into the habits of users across the Internet. This data allows Meta to amass huge amounts of data in a detailed digital fingerprint that Meta keeps on its users and other website visitors.

41. In short, Meta does not act for the sole benefit of IKEA when collecting data from the pixel that IKEA installed on its website.

42. A review of IKEA's website confirmed that as of October 8, 2025, the Meta pixel continued to operate on the website:



*The TikTok Pixel*

43. TikTok offers its own website pixel to web developers, and it is substantially similar to the Meta Pixel. As stated by TikTok, the "TikTok Pixel is a piece of code that you can place on your website that allows you to share website events with TikTok." TikTok recommends setting up the pixel so that the data obtained "reflect[s] a full customer journey on your site, from viewing a product details page to adding an item to a cart and making a purchase."

44. IKEA partnered with TikTok to install its pixel on IKEA's website.

45. Among other information, the TikTok pixel collects the following:

- **Timestamp:** Used to determine when website actions took place, like when a page was viewed or when a product was purchased.
- **IP Address:** Used to determine the geographic location of an event.

- **User Agent:** Used to determine the device make, model, operating system, and browser information.
- **Metadata & Button Clicks:** Includes descriptive page metadata, structured microdata, page performance data, button clicks, and other information that can also be used for personalized ads.

46. Additionally, because IKEA has decided to use TikTok's "AutoAdvanced Matching" technology, TikTok scans every website for information. Thus, when the website asks for information, such as name, date of birth, and address, the information is sent simultaneously to TikTok, so that TikTok can isolate with certainty the individual to be targeted.

47. TikTok's tracking pixel is a "pen register" because it is a device or process that records or decodes dialing, routing, addressing, or signaling information from the electronic communications transmitted to or from IKEA's website.

48. Like Meta, TikTok provides its pixel for free. However, also like Meta, TikTok does not provide the pixel for altruistic reasons for the sole benefit of IKEA. Instead, TikTok's business is based in part on data collection, which TikTok then relies on to sell ads on its platform.

49. A review of IKEA's website confirmed that as of October 8, 2025, the TikTok pixel continued to operate on the website:

[Screenshot: TikTok Pixel Helper showing "1 pixel found on www.ikea.com." IKEA US, ID: CR6808BC77UBVEOEFGAG, Pageview, Event Details — Page URL: Hide https://www.ikea.com/us/en/, Load Time: 55 ms, Timestamp: 2025-10-08 17:06:19, Setup Method: Custom Code]

## Tolling, Concealment, and Estoppel

50. Any statute of limitation applicable to Plaintiff's or class members' claims are tolled as a result of IKEA's concealment of its conduct alleged here.

51. Plaintiff and class members did not have information essential to pursue their claims, without any fault or lack of diligence on their own part.

52. Under the circumstances, IKEA was under a duty to clearly and unequivocally disclose the full and unadorned truth about its activities, including how the information being collected was used by IKEA and third parties like Meta and TikTok. IKEA is therefore estopped from relying on any statute of limitations.

53. The applicable statute of limitations has been tolled by operation of the discovery rule. Plaintiffs and other class members could not have learned through the exercise of reasonable diligence of IKEA's conduct as alleged herein.

## CLASS ALLEGATIONS

54. **Class Definition:** Plaintiff brings this action on behalf of the following class:

All people in California who visited the website ikea.com/us.

55. Subject to additional information obtained through further investigation and discovery, the foregoing class definition may be expanded or narrowed by amendment or in the motion for class certification, including through the use of subclasses.

56. Excluded from the putative classes are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

57. **Numerosity.** Class members are so numerous that their individual joinder is impracticable. The class includes thousands of consumers.

58. **Commonality and Predominance**. Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to:

(a) Whether Defendant is liable for the causes of action asserted herein.

(b) Whether the Court may enter an injunction designed to reduce the risk of future harm to Plaintiff and class members;

59. **Typicality.** Plaintiff's claims are typical of the claims of the class members because Plaintiff and the class members were exposed to the same uniform wrongful conduct.

60. **Adequacy**. Plaintiff will fairly and adequately protect the interests of class members. Plaintiff has retained qualified counsel and has no interests that are antagonistic to those of the Class.

61. **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for class members; the class is readily definable; prosecution as a class action

avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

62. Defendant has acted or failed to act on grounds generally applicable to class members, thereby making final injunctive relief appropriate with respect to the class members.

63. Without a class action, Defendant will continue a course of action that will result in further damages to the class members.

## COUNT I
## Violations of California Invasion of Privacy Act
## Cal. Penal Code § 638.51(a)

64. Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

65. Plaintiff brings this cause of action individually and on behalf the California class.

66. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

67. California Penal Code § 638.51 prohibits any person from using a pen register without a court order.

68. The technologies at issue here are "pen registers" because they are a device or process that records or decodes dialing, routing, addressing, or signaling information from the electronic communications transmitted to or from subject tax filing websites.

69. The technologies gather data about the website visitors based on their website interactions.

70. The technologies collect literally dozens of data points about Plaintiff and class members every time they visited a subject website, including personal information, operating system information, browser information, device type usage, geolocation data, and information that is used to match the data with the website visitor.

71. IKEA was not authorized by any court order to use a pen register to track Plaintiff's and class member's location data and other information.

72. Plaintiff did not consent to the use of the pen register.

73. IKEA's conduct was intentional and knowing. IKEA chose to install the trackers at issue on its website even though they are not necessary for the website's functionality. Hence, IKEA knew how the pixels worked and what they did, or was willfully blind to those facts.

74. Plaintiff seeks all relief available under CIPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an order certifying the classes alleged in this complaint, and naming Plaintiff as the representative of those classes;

b. For an order declaring Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and class members on all counts asserted herein;

d. For statutory damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For injunctive relief as pleaded or as the Court may deem proper; and

g. For an order awarding Plaintiff and class members their reasonable attorneys' fees, expenses, and costs of suit.

# JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 9, 2025                                    Respectfully submitted,

    /s/   Joel D. Smith

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail:  joel@skclassactions.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

*Attorneys for Plaintiff*