**PERKINS COIE LLP**
James G. Snell, Bar No. 173070
JSnell@perkinscoie.com
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300

Mikella M Hurley (admitted *pro hac vice*)
Email: MHurley@perkinscoie.com
700 Thirteenth St. NW, Ste. 800
Washington, DC 20005
Telephone: 202.654.6233

Addison W. Bennett, Bar No. 333567
ABennett@perkinscoie.com
2525 E. Camelback Rd., Suite 500
Phoenix, AZ 85016-4219
Telephone: 602.851.8083

Aaron R. Goldstein, Bar No. 239423
AGoldstein@perkinscoie.com
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900

*Attorneys for Defendant*
IKEA NORTH AMERICA SERVICES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ERIN WEILER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

IKEA NORTH AMERICA SERVICES, LLC,

Defendant.

Case No. 2:25-cv-09659-PA-PVC

**DEFENDANT IKEA NORTH AMERICA SERVICES, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS**

**[FED. R. CIV. P. 12(b)(1), (6)]**

Date: Monday, January 26, 2026
Time: 1:30 p.m.
Courtroom: 9A
Judge: Hon. Percy Anderson

ORAL ARGUMENT REQUESTED

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 26, 2026 at 1:30 p.m. in Courtroom 9A of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, IKEA North America Services, LLC will, and hereby does, move, pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing with prejudice this case brought by Plaintiff Erin Weiler, and the putative class.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such other and further matters as the Court may consider.

This Motion is made following the conferences of counsel which took place by telephone on November 6 and December 16, 2025, in accordance with Civil Local Rule 7-3. The parties were unsuccessful in their attempts to resolve their dispute and now require the Court's assistance.

DATED: December 17, 2025 **PERKINS COIE LLP**

By: */s/ James G. Snell*
James G. Snell, 173070
JSnell@perkinscoie.com

Attorneys for Defendant
IKEA NORTH AMERICA SERVICES, LLC

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. SUMMARY OF FACTUAL ALLEGATIONS ........ 3

III. ARGUMENT ........ 4

A. Plaintiff Lacks Article III Standing ........ 4

B. The Complaint Should be Dismissed for Failure to Plead Facts That State a Plausible Claim ........ 8

C. Plaintiff's Legal Theory is Flawed ........ 10

1. The Complaint does not plead a "pen register" as a matter of law ........ 11

2. IKEA is exempt as a party to any communication ........ 13

3. Plaintiff's legal theory misreads CIPA, misunderstands California law, and invites absurd results ........ 15

D. The Rule of Lenity Warrants Dismissal. ........ 21

IV. CONCLUSION ........ 21

CERTIFICATE OF COMPLIANCE ........ 23

# TABLE OF AUTHORITIES

**Page(s)**

*AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132 (9th Cir. 2024) .......... 21

*Apple Inc. v. Superior Ct.*, 56 Cal. 4th 128 (2013) .......... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 8

*Augustine v. Great Wolf Resorts, Inc.*, No. 23-cv-281, 2024 WL 3450967 (S.D. Cal. July 18, 2024) .......... 16

*Barsoumian v. Aurora Loan Servs, LLC*, No. 12-cv-4368, 2012 WL 6012984 (C.D. Cal. Dec. 3, 2012) .......... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 8, 9, 10

*Bradshaw v. Lowe's Cos.*, No. 25-cv-0742, 2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) .......... 7

*Buesking v. Princess Cruise Lines, Ltd.*, No. 24-cv-4935, 2025 WL 806327 (C.D. Cal. Jan. 22, 2025) .......... 9

*Capitol Recs. Inc. v. Thomas-Rasset*, No. 06-cv-1497, 2009 WL 1664468 (D. Minn. June 11, 2009) .......... 2, 15, 20

*Center for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019) .......... 9

*Columbia Pictures Indus. v. Bunnell*, No. 06-cv-1093, 2007 WL 2080419 (C.D. Cal. May 29, 2007) .......... 12

*Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001) .......... 17

*Doe v. Eating Recovery Ctr. LLC*, No. 23-cv-5561, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) .......... 3, 18, 21

*Dyna-Med, Inc. v. Fair Emp. & Hous. Com.*, 43 Cal. 3d 1379 (1987) .......... 14, 16

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
9 F.4th 1167 (9th Cir. 2021) .......... 11

*Fregosa v. Mashable, Inc.*,
No. 25-cv-1094, 2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... 20

*Garcia v. McCutchen*,
16 Cal. 4th 469 (1997) .......... 12, 13

*Gardena Hosp., L.P. v. Baass*,
99 Cal. App. 5th 678 (2024) .......... 19

*Gonzales v. Uber Techs., Inc.*,
305 F. Supp. 3d 1078 (N.D. Cal. 2018) .......... 17

*Greenley* v. *Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 20

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) .......... 6

*Heiting v. Taro Pharms. USA, Inc.*,
709 F. Supp. 3d 1007 (C.D. Cal. 2023) .......... 16

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 14

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......... 13, 14

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) .......... 6, 7

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .......... 21

*Licea v. Hickory Farms LLC*,
No. 23STCV26148, 2024 WL 1698147
(Cal. Super. Ct. Mar. 13, 2024) .......... 20

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .......... 17

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) .......... 10

*Mendoza v. Fonseca McElroy Grinding Co.*,
11 Cal. 5th 1118 (2021) .......... 15

*Mirmalek* v. *L.A. Times Commc'ns LLC*,
No. 24-cv-1797, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 20

*Moody v. C2 Educ. Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) .......... 10

*Murray Co. v. Occupational Safety & Health Appeals Bd.*,
180 Cal. App. 4th 43 (2009) .......... 19

*Nabozny v. Optio Sols. LLC*,
84 F.4th 731 (7th Cir. 2023) .......... 5

*Oganyan v. Biolife Plasma Servs. L.P.*,
No. 25-cv-99, 2025 WL 2979619 (E.D. Cal. Oct. 22, 2025) .......... 7

*Ornelas v. Randolph*,
4 Cal. 4th 1095 (1993) .......... 19

*People v. Blair*,
74725 Cal. 3d 640 (1979) .......... 11

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 1, 4, 5, 7

*Przybylak v. Bissell Better Life LLC*,
No. 19-cv-2038, 2019 WL 8060076 (C.D. Cal. July 19, 2019) .......... 4

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 14

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .......... 20

*Rodriguez v. Culligan Int'l Co.*,
No. 25-cv-225, 2025 WL 3064113 (S.D. Cal. Nov. 3, 2025) .......... 6

*Rodriguez v. Plivo Inc.*,
No. 24STCV08972, 2024 WL 5184413
(Cal. Super. Ct. Oct. 2, 2024) .... 12, 13, 21

*Rodriguez v. Sparc Grp., LLC*,
No. 24STCV26946, 2025 Cal. Super. Lexis 41697
(Cal. Super. Ct. July 9, 2025) .... 15

*Sanchez v. Cars.com Inc.*,
No. 24STCV13201, 2025 WL 487194
(Cal. Super. Ct. Jan. 27, 2025) .... 12, 17

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .... 20

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .... 5

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .... 8, 10

*Thomasson v. GC Servs. Ltd. P'ship*,
321 F. App'x 557 (9th Cir. 2008) .... 13

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .... 4, 7

*Twitter, Inc. v. Garland*,
61 F.4th 686 (9th Cir. 2023) .... 16

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .... 12

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988) .... 16

*United States v. Caira*,
833 F.3d 803 (7th Cir. 2016) .... 6

*United States v. Christie*,
624 F.3d 558 (3d Cir. 2010) .... 6

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .... 6

*United States v. Lanier*,
520 U.S. 259 (1997) .................... 21

*United States v. Morel*,
922 F.3d 1 (1st Cir. 2019) .................... 6

*United States v. N.Y. Tel. Co.*,
434 U.S. 159 (1977) .................... 11

*United States v. Nosal*,
676 F.3d 854 (9th Cir. 2012) .................... 21

*United States v. Taketa*,
923 F.2d 665 (9th Cir. 1991) .................... 11

*Williams v. What If Holdings, LLC*,
No. 22-cv-3780, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .................... 14

*Wisconsin Pro. Police Ass'n v. Public Serv. Comm'n of Wis.*,
555 N.W.2d 179 (Wis. Ct. App. 1996) .................... 14

**STATUTES**

18 U.S.C. § 3121 .................... 11

18 U.S.C. § 3123 .................... 11

Cal. Civ. Code § 1798.120 .................... 18

Cal. Civ. Code § 1798.140 .................... 18

Cal. Civ. Proc. Code § 1859 .................... 19

Cal. Civil Code § 1798.100 .................... 18

Cal. Penal Code § 637.2 .................... 10

Cal Penal Code § 638.50 .................... 3, 13

Cal. Penal Code § 638.51 .................... *passim*

**RULES**

Federal Rule of Civil Procedure 12(b)(1) .................... 4

**OTHER AUTHORITIES**

Akamai, Glossary: What is Blackhole Routing? .......... 20

Assembly Bill. No. 566 (Oct. 8, 2025), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id= 202520260AB566 .......... 18

Assembly Comm. on Privacy and Consumer Prot., Assembly Bill No. 929 (Apr. 21, 2015) .......... 11

Rob Bonta, Attorney General: Privacy Policy .......... 2

Tilman Harmeling, *What you need to know about consent management: A complete guide,* Usercentrics (Mar. 26, 2025) .......... 19

United States Courts: Privacy Policy .......... 2

## I. INTRODUCTION

Like nearly every business in the United States today, IKEA North America Services, LLC operates a website. And like virtually all other websites, ikea.com/us relies upon third-party software for a variety of legitimate and routine business purposes. Common examples include software to help developers improve their websites, marketing tools to reach consumers, security software to protect against malicious activity, and privacy and consent-management software required to comply with a patchwork of privacy statutes including the California Consumer Privacy Act ("CCPA"). Owing to features that are foundational to the design of the Internet, when a visitor accesses a public website, their IP address is necessarily exposed to that website and to third-party software operating on that website.

Plaintiff here contends that, every time any person visits its website, IKEA commits a *criminal* violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 638.50, 638.51 (the "Pen/Trap Act"), because the visitor's IP address and device information may be exposed to third-party software, which Plaintiff claims is a "pen register," Compl. ¶¶ 2, 6. According to Plaintiff's theory, IKEA cannot use these supposed "pen registers" on its own site unless it either obtains a court order or the prior consent of every visitor. While Plaintiff focuses on just two examples of third-party software—the "Meta Pixel" and "TikTok Pixel," *see id.* ¶¶ 32–49—Plaintiff's theory is so broad that it would cover all third-party tools that websites use for everything from cybersecurity to privacy compliance. For reasons set out below, Plaintiff's theory cannot withstand scrutiny.

But this case fails at the threshold because Plaintiff lacks Article III standing, as made clear by the Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025). In *Popa*, the court held that a plaintiff lacked standing for claims involving alleged website tracking and privacy intrusions because, absent an intrusion into "embarrassing, invasive, or otherwise private" information of the type that was actionable at common law, the plaintiff had no concrete injury. *Id*. at 791.

If the Court reaches the substantive allegations, it will find that Plaintiff fails to state a claim. To begin, the Complaint relies upon generalized and unsupported claims about third parties and is devoid of basic factual allegations that plausibly assert that IKEA did anything to Plaintiff, let alone injure her.

Plaintiff also has no cognizable legal theory of a pen register, for three reasons. *First,* pen registers capture the *destination* dialing, routing, addressing, or signaling information for an *outgoing* communication from a monitored device, such as the numbers someone dials from a telephone, or the addresses of websites that someone visits. Here, Plaintiff accuses IKEA of capturing Plaintiff's *own IP address* as she accessed IKEA's website. *See* Compl. ¶ 28. But pen registers record the equivalent of "called" numbers from a device—*i.e.*, the *outgoing* or *destination* information for a communication, but not the *originating* information about the device that initiates the communication. *Second*, IKEA—a party to any alleged communications with the website—is exempt from liability under CIPA, which has long been interpreted to penalize only intrusions by *third parties* into private conversations. *Third*, Plaintiff's interpretation of CIPA misreads its text, its history, and its placement within a broader scheme of California privacy law, leading her to a patently absurd reading of the law that would criminalize the entire modern Internet. If Plaintiff were correct, "then the Internet could not function because standard computer operations require recording IP addresses." *Capitol Recs. Inc. v. Thomas-Rasset*, No. 06-cv-1497, 2009 WL 1664468, at *3 (D. Minn. June 11, 2009). This explains why the "trackers" about which Plaintiff complains are ubiquitous: everyone from the California Attorney General to this Court's own official website uses similar technology.[1] If nothing else, CIPA's ambiguities justify dismissal under the rule of lenity. CIPA is a criminal statute, one that a federal district judge rightfully called "borderline impossible" to

---

[1] *See*, Rob Bonta, Attorney General: Privacy Policy, https://robbonta.com/privacy-policy/; United States Courts: Privacy Policy, https://www.uscourts.gov/privacy-security-policy.

apply and "total mess" that "gets bigger and bigger as the world continues to change and as courts are called upon to apply CIPA's already-obtuse language to new technologies." *Doe v. Eating Recovery Ctr. LLC*, No. 23-cv-5561, 2025 WL 2971090, at *1 (N.D. Cal. Oct. 17, 2025) (Chhabria, J.).

For these reasons, the Court should dismiss the Complaint.

## II. SUMMARY OF FACTUAL ALLEGATIONS

A "pen register" under CIPA is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Plaintiff alleges that so-called "trackers" embedded on ikea.com/us are pen registers. *E.g.*, Compl. ¶¶ 2–3.

Much of Plaintiff's Complaint is directed at "The Problem of Website Trackers" in general. *See, e.g.*, Compl. ¶¶ 23–31. According to Plaintiff, visiting a website prompts the visitor's browser to "make a 'request' for that site." *Id.* ¶ 23. The website then responds with instructions on how to display the website. *Id.* As part of this process, Plaintiff alleges that a "tracker" can capture certain information about the visitor's browser, such as "screen settings, browser details, OS [operating system] info, and IP address." *Id.* ¶ 26. This process, which Plaintiff calls "fingerprinting," *id.* ¶ 25, permits advertisers to "target specific households, businesses, and even individuals with ads[.]" *Id.* ¶ 29.

In the Complaint's limited discussion of IKEA, Plaintiff alleges that IKEA uses two so-called "trackers": the Meta Pixel and the TikTok Pixel. Compl. ¶¶ 33, 43. Specifically, she alleges that IKEA "partnered with Meta to install its pixel on IKEA's website," *Id.* ¶ 34, which supposedly collects "dozens of data points" about website visitors, *id.* ¶ 36. But instead of identifying these data points, she simply lists vague categories like "personal information, operating system information, browser information," and "identifying information." *Id.* ¶¶ 36. 70. Plaintiff also alleges that IKEA "partnered with TikTok to install its pixel on IKEA's website," thereby

capturing such visitor information as the "[t]imestamp" of "certain actions" on the website like a page-view, the visitor's "IP address," "device make, model, operating system, and browser information," and other "metadata" about the visitor's activity on the website." *Id.* ¶ 45.

Plaintiff says little about her own visits to IKEA's website, and nothing about the specific information the pixels allegedly captured about her. She states that she visited the website on five occasions between December 2024 and May 2025. Compl. ¶ 6. She also broadly asserts that the website "contained the tracking technologies" and "hence, those technologies tracked her website activities." *Id.* ¶ 6. But she says nothing about what those supposed "website activities" entailed, how exactly she was allegedly "tracked," or even what specific data points the "tracking technologies" might have captured. *Id.* At one point, she glancingly alleges that the Meta Pixel "collected … data points about Plaintiff," *id.* ¶ 36, but she makes no similar allegation about the TikTok Pixel, *id.* ¶¶ 43–49. She does not allege that she suffered any loss, harm, or injury.

## III. ARGUMENT

### A. Plaintiff Lacks Article III Standing.

At the threshold, Plaintiff fails to allege a cognizable injury resulting from IKEA's alleged "tracking." Compl. ¶ 6. This deprives the Court of subject-matter jurisdiction because Plaintiff lacks Article III standing. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 788 (9th Cir. 2025). The Court should dismiss this action under Federal Rule of Civil Procedure 12(b)(1). *See Przybylak v. Bissell Better Life LLC*, No. 19-cv-2038, 2019 WL 8060076, at *2 (C.D. Cal. July 19, 2019) (Anderson, J.).

The Constitution "limits the federal judicial power" to "Cases" or "Controversies" in which a plaintiff has standing. *Popa*, 153 F.4th at 788; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "As the party invoking federal jurisdiction," Plaintiff "bear[s] the burden of demonstrating that [she] ha[s]

standing." *Id*. at 430–31. Plaintiff's complaint here fails to demonstrate one of Article III's most fundamental requirements: "concrete injury." *Popa*, 153 F.4th at 788.

"A 'concrete' injury 'must actually exist'; put differently, it must be 'real, and not abstract.'" *Popa*, 153 F.4th at 788. To that end, when a complaint alleges an invasion-of-privacy, as here, the standing inquiry remains focused on whether the injury is "'*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Plaintiff must show that the alleged intangible injury has a "historical or common-law analogue." *Popa*, 153 F.4th at 789 (citing *Spokeo*, 578 U.S. at 424). Courts must "assess whether an individual plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system." *Popa*, 153 F.4th at 791. "In short, there existed no free-roaming privacy right at common law" sufficient to establish standing upon the bare allegation that someone has violated a privacy-oriented statute. *Id*. at 792.

Plaintiff pleads no violation of any analogous common-law torts, and precedent confirms that there are none. As the Ninth Circuit recently held, an allegation that a website has captured visitors' activities through "snippets of … code" to track "consumer data" about website visits sounds in the two "common-law privacy torts of intrusion upon seclusion and public disclosure of private facts." *Popa*, 153 F.4th at 786, 791; *see also Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735 (7th Cir. 2023) (no concrete injury based on bare "invasion-of-privacy" theory). Both torts require demonstrating "'highly offensive' interferences or disclosures" of information that is "embarrassing, invasive, or otherwise private." *Id*. at 791.

To the extent that the Complaint articulates how Plaintiff might have been injured at all, her theory is not "remotely similar" to the "privacy-related harms" that were recognized at common law. *Popa*, 153 F.4th at 792. To begin, the bulk of Plaintiff's Complaint focuses on generalized allegations regarding "trackers," including expansive policy objections to the alleged collection of IP-address information and "IP targeting" on the Internet. Compl. ¶¶ 26, 28–31, 43. But it is well

established that there is no reasonable "expectation of privacy" in an "IP address" because that information is "voluntarily turned over in order to direct" online "servers" to perform tasks over the Internet. *United States v. Forrester*, 512 F.3d 500, 503 (9th Cir. 2008); *accord United States v. Morel*, 922 F.3d 1, 9 (1st Cir. 2019) (finding that website visitor had no "reasonable expectation of privacy in" his IP address); *United States v. Caira*, 833 F.3d 803, 806 (7th Cir. 2016) (same). The analysis does not change where, as here, a Plaintiff alleges that third parties capture IP addresses: there is "no reasonable expectation of privacy … in an IP address" precisely "*because*" that "that information is also conveyed to and, indeed, from third parties." *See United States v. Christie*, 624 F.3d 558, 574 (3d Cir. 2010) (emphasis added); Compl. ¶¶ 34, 44. Courts have thus "consistently" found that "this reasoning" compels the conclusion that alleged IP-collection pleads no "injury" sufficient to demonstrate standing "under Article III"—including in cases, as here, that proceed under Section 638.51's pen-register prohibition. *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1180 (N.D. Cal. 2025); *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) ("[T]here is no legally protected privacy interest in IP addresses.").

While the Complaint focuses on the collection of IP addresses, it also briefly alleges the collection of other generic device "metadata" such as "button clicks," "timestamp[s]," or device and operating-system information. *E.g.*, Compl. ¶¶ 26, 36, 43. But the same result follows: the collection of such non-invasive metadata about a user's interaction with a website does not support standing because that information, too, has no historical analogue to an actionable privacy harm. *E.g.*, *Khamooshi*, 786 F. Supp. 3d at 1177 (no standing to assert Section 638.51 violation where alleged collection of data "included browser and device data, IP address, and 'other identifying information'"); *Rodriguez v. Culligan Int'l Co.*, No. 25-cv-225, 2025 WL 3064113, at *3 (S.D. Cal. Nov. 3, 2025) (no standing to assert pen register claim for collection of browser and device information). One court even recently

dismissed on standing grounds a Section 638.51 claim alleging improper use of the TikTok Pixel—one of the specific devices at issue here. *See Bradshaw v. Lowe's Cos.*, No. 25-cv-0742, 2025 WL 3171740, at *6 (S.D. Cal. Nov. 12, 2025).

The Ninth Circuit's recent *Popa* decision drives the point home. There, the plaintiff alleged that the defendant's website deployed "session-replay" technology that can "record[ ] the website visitor's electronic communications with the ... website, including their mouse movements, clicks, keystrokes ... URLs of web pages visited, and/or other electronic communications in real-time." 153 F.4th at 786. The court concluded that these allegations amounted to "just a statutory violation" without concrete injury. 153 F.4th at 793. It reasoned that the technology at issue was "most similar to a store clerk's observing shoppers" while they browsed a store. *Id.* at 791. The alleged tracking here does not even go that far. Capturing basic information about access to IKEA's website is, at most, analogous to standing on a sidewalk and observing who enters an IKEA store, which is hardly "embarrassing, invasive, or otherwise private." *Id.* And while Plaintiff summarily asserts that the "widespread collection of IP addresses" exposes "website visitors" to a grab bag of harms such as "cybersecurity risks," Compl. ¶ 31, she does not explain how or why these consequences might result, much less whether she has experienced any.

Here, as in other similar pen-register cases, Plaintiff's claim should be dismissed because she lacks the kind of common-law privacy interest required for standing. *See, e.g.*, *Khamooshi*, 786 F. Supp. 3d at 1182; *Oganyan v. Biolife Plasma Servs. L.P.*, No. 25-cv-99, 2025 WL 2979619, at *3–4 (E.D. Cal. Oct. 22, 2025); *Bradshaw*, 2025 WL 3171740, at *6. Her request for "statutory damages" without "concrete harm" seeks nothing more than IKEA's "compliance with regulatory law," which is no "basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 427–28.

### B. The Complaint Should be Dismissed for Failure to Plead Facts That State a Plausible Claim.

Even if Plaintiff had standing, her Complaint is nothing more than a collection of "threadbare" factual allegations and "conclusory statements" that fail to get her claim for relief "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). It also "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). This Complaint fails because it relies on numerous "naked assertion[s]" devoid of "further factual enhancement," *Twombly*, 550 U.S. at 555, 557, that leave IKEA and the Court guessing as to the Plaintiff's theory of IKEA's liability.

**Threadbare assertions and unwarranted inferences.** The Complaint is notable for how little it says about the parties. Only *two* paragraphs even describe interactions between Plaintiff and IKEA. Compl. ¶¶ 6, 36. The Complaint instead reads as a generalized policy objection to the existence of pixels and "digital 'fingerprinting.'" *Id*. ¶¶ 23–31.

The "Factual Background" contains hypothetical statements that stop short of alleging *any* specific conduct by IKEA or the third-party technologies, let alone unlawful conduct. Describing website "trackers" in general, Plaintiff states that a website "*can* cause your browser" to embed "tracking mechanisms," Compl. ¶ 23, that this data "*can* be used to log online activity," *id*. ¶ 24, that IP address information "*allow[s]* companies to target" users, *id*. ¶ 29, and that the "widespread collection of IP addresses…*exposes* website visitors to various cybersecurity *risks*," *id*. ¶ 31 (emphases added). But a complaint's allegations must "permit the court to infer more

than the mere possibility of injury." *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560 (9th Cir. 2019) (citation modified).

The Complaint's allegations about the third-party software at issue—the Meta Pixel, *id.* ¶¶ 32–42, and the TikTok Pixel, *id.* ¶¶ 43–49—are cursory and abstract, and they do not sufficiently connect Plaintiff's claims about the pixels' alleged tracking to IKEA. A single sentence states that the Meta Pixel "collected literally dozens of data points about Plaintiff and class members every time they visited *a subject website*," including generic categories like "personal information, operating system information, browser information, device type usage, geolocation data, url tracking, and identifying information." *Id.* ¶ 36 (emphasis added). But the Complaint does not allege that IKEA was among the "subject website[s]," or that the pixel collected anything from Plaintiff while on IKEA's website. *See id.* ¶¶ 32–42.

The Complaint provides slightly more detail about the TikTok Pixel, *id.* ¶ 44, but it says virtually nothing about its operation on the IKEA website, or what data it captured about Plaintiff, *id.* ¶¶ 43–49. And while the Complaint contains screenshots allegedly demonstrating that each pixel was running on IKEA website "as of October 8, 2025," *id.* ¶¶ 42, 49, it says nothing about the pixels' operation when Plaintiff allegedly visited the website months or years earlier, *id.* ¶ 6. These "threadbare" factual allegations and "conclusory statements" fail to push Plaintiff's claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Plaintiff makes only one allegation purporting to connect IKEA to the pixels' alleged tracking; according to Plaintiff, IKEA's "website contained the tracking technologies at issue here, and *hence*, those technologies tracked her website activities." Compl. ¶ 6 (emphasis added). This conclusory allegation leaves the "Court to fill several logical gaps to state [her] theory of liability." *Buesking v. Princess Cruise Lines, Ltd.*, No. 24-cv-4935, 2025 WL 806327, at *5 (C.D. Cal. Jan. 22, 2025).

**Legal conclusions and conclusory statements.** Elsewhere, to the extent the Complaint attempts to connect its generalized descriptions of the pixels to IKEA, it does so through formulaic, word-for-word recitations of the "elements of [her] cause of action." *Twombly*, 550 U.S. at 557; *see* Compl. ¶¶ 37, 47. But ascribing "labels and conclusions" to a factually deficient complaint fails to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

**Internal inconsistencies.** The Complaint is also internally inconsistent about where and how IKEA installed the alleged pen registers—alleging in one breath that "Defendant causes" the trackers "to be installed on Website *visitors' Internet browsers*," Compl. ¶ 2, but alleging in next breath that IKEA installs the pixels on "Ikea's *website*," *id*. ¶¶ 34, 44 (emphases added). Allegations that cannot even be squared with each other are inherently implausible. *See Barsoumian v. Aurora Loan Servs*., LLC, No. 12-cv-4368, 2012 WL 6012984, at *4 (C.D. Cal. Dec. 3, 2012) (Anderson, J.). Such "internally inconsistent" allegations, *id*., about the fundamental nature of IKEA's alleged wrongdoing fail to give IKEA the "fair notice" that it needs "defend itself effectively," *Starr*, 652 F.3d at 1204.

**No alleged harm.** Similarly, Plaintiff does not allege she "has been injured by a violation" of CIPA, an element of her cause of action. Cal. Penal Code § 637.2; *see also Moody v. C2 Educ. Sys. Inc*., 742 F. Supp. 3d 1072, 1078 (C.D. Cal. 2024) ("injury" is "necessary" to cause of action under CIPA). While Plaintiff claims that IKEA captured her IP address, Compl. ¶ 6, and that the Meta Pixel captured "dozens of data points" about her, *id*. ¶ 36, she never explains *how* this alleged conduct caused her any *injury*. Plaintiff offers nothing more than conjecture and speculation about what Meta or TikTok might do with her data. *See* Compl. ¶¶ 40, 48.

## C. Plaintiff's Legal Theory is Flawed.

The allegations that Plaintiff does muster do not allege a "cognizable legal theory" of a pen register. *Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097, 1104 (9th Cir. 2008). Plaintiff's legal theory: (1) misunderstands the fundamental

definition of a "pen register"; (2) ignores that IKEA is exempt as a party to any underlying communication; and (3) strains the text, context, and history of CIPA so far that it invites patently absurd results with potentially disastrous consequences.

**1. The Complaint does not plead a "pen register" as a matter of law.**

Plaintiff misconstrues a fundamental feature of a pen register: pen registers capture the *destination* dialing, routing, addressing, or signaling information for an *outgoing* communication (e.g., the numbers dialed from a monitored phone), but *not* the *originating* dialing, routing, addressing, or signaling information about *incoming* communications (e.g., the numbers of incoming calls to that monitored phone). *See* Cal. Penal Code § 638.50. Accordingly, the Ninth Circuit, California Supreme Court, and United States Supreme Court have long recognized that a pen register is "a device that records the *numbers dialed* from a monitored telephone." *United States v. Taketa*, 923 F.2d 665, 668 n.1 (9th Cir. 1991) (emphasis added); *see also People v. Blair*, 25 Cal. 3d 640, 654 n.11 (1979); *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 161 n.1 (1977) (a pen register "records the numbers dialed on a telephone"). Congress codified that definition in federal law in 1986, when it adopted the federal Pen/Trap Act, 18 U.S.C. § 3121 *et seq*.

When it adopted California's Pen/Trap Act in 2015, the Legislature did not start from a "blank slate," or draft the "statute based on just its imagination running away." *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 9 F.4th 1167, 1174 (9th Cir. 2021). Rather, the Legislature's express purpose was to fill a gap that had hampered state law-enforcement: without the Act, California law enforcement could not lawfully use pen/traps in criminal investigations. *See* Assembly Comm. on Privacy and Consumer Prot., AB 929, at 9 (Apr. 21, 2015).[2] The Legislature accordingly adopted prohibitions and exemptions are virtually identical to those in the federal Act. *Compare* 18 U.S.C. § 3123 *with* Cal. Penal Code § 638.51.

---

[2] *See* http://www.leginfo.ca.gov/pub/15-16/bill/asm/ab_0901-0950/ab_929_cfa_20150417_173122_asm_comm.html.

In much the same way that legislative enactments of "common-law terms bring[ ] the old soil with them," the historical understanding of a pen register is essential to understanding its basic definition as enacted in Section 638.51. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484 (2023). In transplanting into state law the well-established federal understanding that a "pen register is essentially a device which captures outgoing telephone numbers or IP addresses," the California legislature brought the old soil with it, too. *Columbia Pictures Indus. v. Bunnell*, No. 06-cv-1093, 2007 WL 2080419, at *11 (C.D. Cal. May 29, 2007); *see Sanchez v. Cars.com Inc.*, No. 24STCV13201, 2025 WL 487194, at *3 (Cal. Super. Ct. Jan. 27, 2025) ("[T]he California Legislature adopted the same authorization provision in CIPA section 638.5[1]" as "under the federal Pen Register Act.").

Recognizing the "old soil" that delimits the definition of a pen register, *Twitter*, 598 U.S. at 484, Plaintiff analogizes an IP address to a "telephone number." Compl. ¶ 28. But applying Plaintiff's phone-call analogy, a pen register that monitors Plaintiff would not capture her own IP address (the equivalent of her own phone number), as she alleges. Instead, a pen register would necessarily capture the equivalent of the numbers she *dials*—for instance, information about websites Plaintiff accessed, or other Internet users she contacted. Plaintiff does *not* allege that conduct. She therefore does not allege a pen register. The state trial court has followed this precise logic to require the dismissal of alleged pen-register violations. *See Rodriguez v. Plivo Inc.*, No. 24STCV08972, 2024 WL 5184413, at *2 (Cal. Super. Ct. Oct. 2, 2024) (holding that "[p]en registers collect outgoing information" like the "IP addresses of *websites visited*," not originating information about the *user*'s device (emphases added)). This Court should do the same.

This interpretation of a pen register also "give[s] effect and significance to every word and phrase of" the statute. *Garcia v. McCutchen*, 16 Cal. 4th 469, 476, (1997). While subsection 638.50(b) defines a "Pen register," it is immediately followed by subsection 638.50(c), enacted simultaneously, which defines a "Trap

and trace device." A "trap and trace device" is "a device or process that captures the *incoming* electronic or other impulses that identify the *originating number* or other" information "reasonably likely to identify the *source* of a wire or electronic communication." Cal. Penal Code § 638.50(c) (emphases added). Because a "trap and trace" device expressly captures such "incoming," "originating," or "source" information, a pen register must necessarily capture something else. By defining the term "pen register" to encompass the very same information, Plaintiff turns the trap-and-trace provisions into pure "surplusage" because every trap-and-trace device would also be a pen register. *Garcia*, 16 Cal. 4th at 476. But California statutes must be read to "harmonize the two" subsections "in such a way that no part of either becomes surplusage." *Id*. Accordingly, this Court should find that "pen registers" do not collect "originating information about the user's device," and dismiss Plaintiff's claim. *Plivo Inc*., 2024 WL 5184413, at *2.

**2. IKEA is exempt as a party to any communication.**

Even if the alleged web-tracking here could theoretically be a pen register, Plaintiff's allegations hit another legal roadblock: IKEA cannot be liable because it is a party to any alleged communication between Plaintiff and the website. The Pen/Trap Act cannot logically—or consistently with the statute's purpose—prohibit a party to a communication from capturing or learning information about another party who voluntarily contacts them.

Other provisions of CIPA, originally enacted in 1967, have long been understood to exempt the parties to the underlying communication from liability. CIPA was enacted as a "response to what [the Legislature] viewed as a serious and increasing threat to the *confidentiality of private communications* resulting" from "the development of new devices and techniques for eavesdropping" on "such *private communications*." *Kearney v. Salomon Smith Barney, Inc*., 39 Cal. 4th 95, 115 (2006) (emphases added). Section 632's prohibition on "eavesdropping" is therefore only applicable to third parties. *See, e.g.*, *Thomasson v. GC Servs. Ltd. P'ship*, 321 F.

App'x 557, 559 (9th Cir. 2008) (eavesdropping, as "used in § 632," "refer[s] to a third party secretly listening to a conversation between two other parties."). Likewise, Section 631's primary prohibitions on wiretapping apply only to the "surreptitious monitoring of private conversations" by third parties. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985). Thus, "a party to the communication cannot be liable" under Section 631 for primary wiretapping violations. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020).

The Pen/Trap Act, added decades later, must be read in harmony with the rest of CIPA. *Dyna-Med, Inc. v. Fair Emp. & Hous. Com.*, 43 Cal. 3d 1379, 1387 (1987) ("statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other"). Interpreting Sections 631 and 632 to exempt parties from primary wiretapping and eavesdropping violations—but not similarly interpreting Section 638.51—would give CIPA different meanings and coverage across subsections. To avoid similarly irrational readings and to resolve ambiguities, the state courts routinely clarify CIPA's terms by judicial construction even where "the language … does not explicitly address" the question. *Kearney*, 39 Cal.4th at 119; *see Williams v. What If Holdings, LLC*, No. 22-cv-3780, 2022 WL 17869275, at *2 (N.D. Cal. Dec. 22, 2022) (explaining how "[t]he Supreme Court of California has distilled … down" the text of Section 631). Harmonizing Section 638.51 with the rest of CIPA requires a similar judicial construction.

Recognizing an exception from liability for parties to a communication is also the only way to avoid imposing liability on everyone who uses an entirely commonplace communications tool: caller ID. As courts in other jurisdictions have noted, pen/trap laws "protect telephone users from unauthorized third-party or governmental intrusions"; they do not "protect telephone users from one another." *Wisconsin Pro. Police Ass'n v. Public Serv. Comm'n of Wis.*, 555 N.W.2d 179, 188 (Wis. Ct. App. 1996). By that same logic, pen/trap laws "cannot be intended to prevent individuals who receive electronic communications from recording the IP

information sent to them." *Capitol Recs. Inc. v. Thomas-Rasset*, No. 06-cv-1497, 2009 WL 1664468, at *3 (D. Minn. June 11, 2009). In the context of caller-ID, courts have held that parties to the communication cannot be liable for installing a trap-and-trace device to understand who is calling them. *E.g.*, *Wisconsin Professional Police*, 555 N.W.2d at 187–88. Plaintiffs here cannot skirt that same logical conclusion by labeling the alleged pixels "pen registers." As discussed above, as alleged, the pixels are, at best, trap-and-trace devices. *Supra* pp.11–13. But even if Plaintiff restyled her claim accordingly, it would make no difference; either way, IKEA is exempt as a party to the alleged communications.

**3. Plaintiff's legal theory misreads CIPA, misunderstands California law, and invites absurd results.**

As one California trial court recently concluded, the Pen/Trap Act "cannot reasonably be read" so broadly as to establish liability where a website collects an "IP address"—even when the defendant allegedly enables "third part[ies]" to access that data—or else "every website interaction that identifies electronic information about the user in a manner that allows the website to [f]unction" would become unlawful. *Rodriguez v. Sparc Grp., LLC*, No. 24STCV26946, 2025 Cal. Super. Lexis 41697, at *7–*8 (Cal. Super. Ct. July 9, 2025), *tentative ruling adopted*, 2025 Cal. Super. Lexis 38208 (Cal. Super. Ct. July 9, 2025). Exactly right. If Plaintiff's view of the Pen/Trap Act is correct, and merely collecting a website-visitor's IP address is unlawful, then any website that uses third-party software for anything from cybersecurity to privacy compliance perpetually commits crimes. Plaintiff's view misreads the Act's text and basic purpose, and it boils down to the fundamentally absurd proposition that the California Legislature hid an "elephant[ ]"—criminal liability for commonplace website technologies—in the "mousehole[ ]" of a statute intended to enable state law enforcement to obtain pen/trap orders. *Mendoza v. Fonseca McElroy Grinding Co.*, 11 Cal. 5th 1118, 1135 (2021) (citation modified).

**The statute cannot fairly be read to cover the alleged conduct**. Because "[s]tatutory construction … is a holistic endeavor," the Pen/Trap Act's prohibitions can only be understood as a part of a broader "statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *accord Dyna-Med*, 43 Cal. 3d at 1387. The Act's text, context, and history all demonstrate that the California Legislature never intended to bring the mere act of visiting a website, without more, under CIPA's criminal-law protections for private communications.

First, the exchange of basic metadata that Plaintiff alleges is not the kind of "communication" that can trigger liability under the Pen/Trap Act or other provisions of CIPA. Section 638.50 defines a pen register as an instrument that "records or decodes" certain information about the device "from which a wire or electronic *communication* is transmitted," but not the "*contents*" of that communication. (emphases added). In other words, the Act anticipates that a pen register will capture information about a specific type of communication, *i.e.*, a communication that conveys some "content"—or "substance, purpo[rt], or meaning" of an "intended message"—that is distinct from "record information regarding the characteristics of the message." *Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1017-18 (C.D. Cal. 2023) (cleaned up). Interpreting similar protections for a "communication" under CIPA's wiretap provision (Section 631), courts have held that liability depends on intercepting a "communication with content"—which does not occur when a person merely accesses a website. *Augustine v. Great Wolf Resorts, Inc.*, No. 23-cv-281, 2024 WL 3450967, at *6 (S.D. Cal. July 18, 2024). Placing a pen register is another way to trigger liability as to the same underlying form of communication, by "captur[ing]" dialing or addressing formation "*associated with*" that underlying "communication." *Twitter, Inc. v. Garland*, 61 F.4th 686, 691 n.2 (9th Cir. 2023) (emphasis added). In other words, if merely accessing a website is not a qualifying "communication" with "content" under Section 631, then a mere

website visit also should not trigger liability under Section 638.51 because each section defines a different type of intrusion into the same underlying type of "communication." *See Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) ("opening a webpage" is "not a communication with content").

Second, Section 638.51's enumerated exceptions strongly suggest that the Legislature did not intend the Pen/Trap Act's prohibitions to apply to ordinary websites like IKEA's. The statute provides exceptions for "electronic or wire communication service" providers, so they can engage in routine functions like providing services, protecting their users, and protecting themselves against fraudulent, unlawful, or abusive activity. *See* Cal. Penal Code § 638.51(b)(1)–(5). An "electronic communications service" permits subscribers to "send or receive electronic communications." *Id.* § 1546(e). And ordinary websites, including online retailers that do not provide visitors with a means to send or receive communications to others, are not "electronic communication services." *See Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263, 1270–71 (N.D. Cal. 2001); *see Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 687 (N.D. Cal. 2021). The logical way to read the statute, therefore, is to conclude that the California Legislature was concerned only with the use of pen/traps for substantive communications transmitted on "electronic or wire communications service[s]," but not in other contexts like commercial websites, which do not enable people to communicate with one another. Cal. Penal Code §§ 638.51. Were it otherwise, that would mean that the Legislature intended to prohibit all websites that are not communications services from capturing a website visitor's data in all cases, with no exceptions, even where necessary to operate the website or protect it against malicious activity. The statute simply contains no such textual indication.

Third, that common-sense reading that website visits, without more, cannot trigger liability also makes sense considering the Pen/Trap Act's legislative history. *See Sanchez*, 2025 WL 487194, at *4. As discussed (*supra* pp.11–12), the Legislature

enacted the Act to fill a gap and permit state law enforcement to obtain pen/trap orders in criminal investigations. *See* Assembly Comm. on Privacy and Consumer Prot., *supra* p.12, at 4–5, 11–12 (explaining that the Pen/Trap Act was intended to "[a]uthorize[ ] state and local law enforcement to seek emergency orders for pen registers" and (2) to clarify the evidentiary burden for law enforcement to obtain pen/trap orders). Nothing in the history of that 2015 gap-filling bill suggests that the Act was intended criminalize a website operator's use of technology to log information about traffic to its own site. Not one legislator expressed a contrary view.

In sum, if the "Legislature really intend[ed] to subject companies like [IKEA] to criminal liability for using third-party software to track website activity," one would expect to find *some* indication of that intent in the statute's text, context, or history. *Doe*, 2025 WL 2971090, at *6. There is none.

**More recent and more specific legislation governs.** As another federal court recently explained, the California Consumer Privacy Act ("CCPA") "more clearly speak[s] to the practice of data sharing" by websites. *Doe*, 2025 WL 2971090, at *6 (citing Cal. Civil Code § 1798.100 *et seq*.). The CCPA specifically identifies an "Internet protocol address" as protected "personal information," along with "other similar identifiers," Cal. Civ. Code § 1798.140(o)(1)(A), as well as "Internet or other electronic network activity information," *id*. § 1798.140(o)(1)(F). Rather than *banning* the collection of such information or requiring express consent, the CCPA provides a "right to opt out" from its sale. *Id*. § 1798.120(a). The CCPA's data-sharing provisions have been finetuned—including through 2020's Proposition 24, which strengthened its protections, *see e.g.*, *id*. § 1798.105 (enacting a "right to delete any personal information"), and 2025's AB 566, signed on October 8, 2025 to further strengthen opt-out rights by requiring web browsers to include them.[3]

---

[3]https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202520260AB566.

California follows the "general American law" and principle of "common sense" that a "specific statute controls a general one." *Gardena Hosp., L.P. v. Baass*, 99 Cal. App. 5th 678, 682–83 (2024); *see* Cal. Civ. Proc. Code § 1859. The CCPA, which is both newer and more specific than the Pen/Trap Act, directly speaks to the circumstances under which a website may collect visitor data. It therefore "govern[s] in respect to [the] subject" of website data-tracking, even assuming that the Pen/Trap Act might appear applicable at first blush if read "standing alone" and devoid of broader context. *Murray Co. v. Occupational Safety & Health Appeals Bd.*, 180 Cal. App. 4th 43, 53 (2009).

**Absurd results**. For similar reasons, Plaintiff's interpretation leads to "absurd" results, which California law does not sanction. *Ornelas v. Randolph*, 4 Cal. 4th 1095, 1105 (1993). The Court should decline Plaintiff's invitation to discern a "legislative intent" to criminalize a fundamental feature of the "enormous yet unforeseen advent of online commerce" through statutory language that does not clearly mandate that outcome. *Apple Inc. v. Superior Ct.*, 56 Cal. 4th 128, 150 (2013).

Apart from the basic functioning of modern websites, many other obviously permissible website functions, which are commonly supported by third parties, *must* receive visitors' IP addresses: from consent-management platforms that ascertain a visitor's location to comply with jurisdiction-specific privacy laws California's own CCPA[4]; to software that protects against cyber-attacks like Distributed Denial-of-Service Attacks (DDoS), which are defended by blocking traffic from identified

---

[4] *See* Tilman Harmeling, *What you need to know about consent management: A complete guide*, Usercentrics (Mar. 26, 2025), https://usercentrics.com/knowledge-hub/consent-management/#:~:text=long%2Dterm%20relationships.-,What%20is%20a%20consent%20management%20platform%20(CMP)?,control%20over%20their%20personal%20data.

malicious IP addresses.[5] Plaintiff's theory that the mere capturing of a website visitor's IP address constitutes a pen register means that all of these load-bearing features of the modern Internet—which are essential to comply with even other California laws—are illegal.

Common sense has led courts in California and elsewhere to reject "[s]uch a broad based interpretation [that] would potentially disrupt a large swath of internet commerce." *Licea v. Hickory Farms LLC*, No. 23STCV26148, 2024 WL 1698147, at *4 (Cal. Super. Ct. Mar. 13, 2024); *Capitol Records*, 2009 WL 1664468, at *3 (if pen-register prohibitions "did apply in those cases, then the Internet could not function"). This Court should do the same.

* * *

While a handful of federal district courts have recently declined to dismiss pen-register claims, litigation over the Pen/Trap Act is remarkably novel: no appellate court—state or federal—has ever interpreted it. Before 2023, "no court ha[d] interpreted this provision of CIPA" at all. *Greenley* v. *Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). Many of the courts to recently interpret the statute have merely rejected an argument that IKEA does not make, which is that the Pen/Trap Act applies as a categorical matter only to "telephone technology." *Mirmalek* v. *L.A. Times Commc'ns LLC*, No. 24-cv-1797, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024); *see, e.g.*, *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929 (C.D. Cal. 2025). IKEA is aware of no more than two district court decisions bearing on any of its more precise arguments here. *See Fregosa v. Mashable, Inc.*, No. 25-cv-1094, 2025 WL 2886399, at *6 (N.D. Cal. Oct. 9, 2025); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 929 (N.D. Cal. 2024). Respectfully, those decisions were incorrect for the reasons IKEA has stated, including because *state*

[5] *See* Akamai, Glossary: What is Blackhole Routing?, https://www.akamai.com/glossary/what-is-blackhole-routing (last visited Dec. 15, 2025).

courts have come out the other way. *E.g.*, *Plivo*, 2024 WL 5184413, at *2. This Court should use its own "best judgment" to read the statute and "predict[ ]" how California courts would decide the issues. *AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136 (9th Cir. 2024) (citation modified).

**D. The Rule of Lenity Warrants Dismissal.**

At the very least, for each of the reasons set out above (*supra* pp. 10–20), the Pen/Trap Act is ambiguous. The Court should therefore dismiss the Complaint under the rule of lenity, which limits penal statutes "to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997). This rule applies with equal force where, as here, a criminal law is applied in a "noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). When in doubt, the Court "must choose the interpretation least likely to impose penalties unintended" by the legislature. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012).

The recent *Doe* decision in the Northern District is instructive. 2025 WL 2971090, at *1. Identifying ambiguities in closely related Section 631(a), Judge Chhabria observed that it can be "borderline impossible to determine whether a defendant's online conduct fits within the language of" CIPA. *Id*. There, the alleged conduct was remarkably similar to Plaintiff's allegations here: the use of "data analytics" software to "track website activity." *Id*. at *6. But the court could not discern that the Legislature "really mean[t] to criminalize" such conduct through CIPA, especially in light of other California laws like CCPA that more clearly speak to the issue. *Id*.; *see* pp. 18–19, *supra*. The court therefore determined that the rule of lenity warranted summary judgment for the defendant. *Id*. That same logic warrants dismissal here.

## IV. CONCLUSION

The Court should dismiss the Complaint in its entirety, with prejudice.

Respectfully submitted,

DATED: December 17, 2025

**PERKINS COIE LLP**

By: */s/ James G. Snell*

James G. Snell, 173070
JSnell@perkinscoie.com

Attorneys for Defendant
IKEA NORTH AMERICA SERVICES, LLC

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for IKEA North America, LLC, certifies that this brief is written in Times New Roman font, size 14, and does not exceed 25 pages, which complies with this Court's Standing Order 6(b). This brief contains 6,825 words.

DATED: December 17, 2025 **PERKINS COIE LLP**

By: */s/ James G. Snell*
James G. Snell, 173070
JSnell@perkinscoie.com

Attorneys for Defendant
IKEA NORTH AMERICA SERVICES, LLC